**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | |
|---|---|
| **KEVIN COATES**<br>329 Nature Walk Lane<br>Pasadena, Maryland 21122<br>*Resident of Anne Arundel County*<br><br>Plaintiff,<br><br>***Individually and on Behalf of All***<br>***Similarly Situated Employees***<br><br>v.<br><br>**BRAY & SCARFF, INC.**<br>9718 Barrister Court<br>Bethesda, Maryland 20814<br><br>Serve: John Dennis Scarff, Sr., R.A.<br>　　　 9718 Barrister Court<br>　　　 Bethesda, Maryland 20814<br><br>　　　　 Defendant. | Civil Action No.:<br><br><br><br>Collective/Class Action Claim<br><br><br><br><u>Jury Trial Requested</u> |

## COLLECTIVE AND CLASS COMPLAINT FOR WAGES OWED

KEVIN COATES, Plaintiff, on behalf of himself and all others similarly situated, by and

through his undersigned counsel and The Law Offices of Peter T. Nicholl, hereby submits his

Complaint against BRAY & SCARFF, INC., Defendant, to recover unpaid wages, liquidated

damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair

Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA");

unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland

Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL");

and unpaid wages, treble damages, interest, reasonable attorneys' fees and costs under the

Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (hereinafter, "MWPCL"), and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

Defendant is engaged in the sale and maintenance of household appliances. Defendant also provides the related services of custom installation and remodeling. Defendant has served the D.C. metropolitan area for over eighty (80) years. It has grown to be the largest independent appliance retailer in Maryland.

Defendant maintains both a remodeling and distribution department. [1] Defendant's distribution department is focused on the sale, maintenance and repair of its products. Its remodeling department is focused on custom design for common areas in the home. Defendant maintains a large and diverse team of professionals to assist its customers with new ideas and current trends.

Defendant owns and operates several retail establishments in Maryland, Virginia and the District of Columbia. There are approximately thirteen (13) stores total. Defendant's customers can purchase appliances at any of these establishments.

Defendant employs a wide array of employees to manage and run its stores. Defendant hired Plaintiff and others similarly situated to perform work as technicians. Their duties centered on servicing the appliances purchased by Defendant's customers. This ranged from routine maintenance to fixing products that malfunctioned.

---

[1] All unlawful conduct discussed within this Complaint are specific to the policies implemented within Defendant's distribution department. None of Plaintiff's assignments were associated with Defendant's remodeling department. The payment practices specific to the remodeling department are currently being investigated.

Each morning, Plaintiff and other technicians would report to Defendant's retail store in Alexandria, Virginia.[2] They would clock-in upon arrival and from there, acquire the necessary materials needed to perform their repair duties. This was a routine practice throughout their employment.

Plaintiff and others similarly situated were given service "tickets" that outlined their daily activities. Each ticket contained the contact information of the customer that was scheduled to receive repair services. Plaintiff and others would then drive to the customer's home in order to perform the needed work. This was accomplished using a company vehicle. Plaintiff and other technicians would drive to multiple residences until all of their assignments were finished. This was a customary practice each day.

Defendant's customers reside in various regions throughout Maryland, Virginia and the District of Columbia. The customers for whom the technicians provide service is based on the particular state to which a technician is assigned.[3]

Although each technician is assigned to a specific state, the service tickets pertaining to their work assignments are not restricted to a particular geographic area within the state. As a result, Plaintiff and other technicians were often required to complete multiple assignments throughout various regions within their state. For example, their days would often start with a work assignment in Northern Virginia. From there, they would have to travel to another part of Virginia to complete their additional work orders. It was common for Plaintiff's and other

---

[2] On September 12, 2016, Defendant changed its policies regarding where its technicians were to report. Technicians are now required to report to Defendant's Laurel, Maryland facility, where Defendant maintains its headquarters. Consequently, from September 12, 2016 until the time his employment ended, Plaintiff reported to Laurel, Maryland each morning. This is where he clocked in and acquired the materials needed for the day. From there, he traveled to his first scheduled assignment.

[3] These assignments were not based on the residence of a technician. For example, for the duration of the relevant period, although Plaintiff was a resident of Maryland, he was assigned to provide service for Defendant's Virginia customers.

technicians' assignments to be many miles apart. They had to provide service in multiple areas. These conditions forced Plaintiff and other technicians to drive long distances over the course of a day. It was common for Plaintiff and other technicians to have to travel for hours between their assignments.

Despite the exceedingly large area Plaintiff and other technicians had to cover, their daily assignments increased over time. This directly resulted from the expansion of Defendant's business. However, even with this growth, Defendant's policies did not change. This was regardless of the fact that Defendant failed to hire additional technicians to assist with the increased number of maintenance and repair orders. Plaintiff and other technicians were still tasked with completing all of their service tickets. It was Defendant's strict policy that all service tickets assigned to a technician be completed before that technician could leave each day. This was true regardless of the travel time associated with the distance between the technicians' work orders.

Having to travel to multiple service areas in a single day forced Plaintiff and other technicians to work long hours. These conditions caused Plaintiff and others similarly situated to routinely work hours outside of their regular schedule. This resulted in Plaintiff and other technicians having to consistently work well over forty (40) hours each week.

Defendant failed to properly compensate Plaintiff and others similarly situated. Defendant refused to pay Plaintiff and other technicians correctly for the long hours they worked. Defendant was able to complete this illegal act by not paying Plaintiff and others similarly situated for any hour they worked over forty (40) each week.

This resulted in Plaintiff and other technicians' failure to receive overtime wages. It is Defendant's company policy to not pay overtime. This is so despite the fact that Plaintiff and

others similarly situated consistently worked, and continue to work, overtime hours. Working these hours did not impact the manner in which they were paid. Plaintiff and other technicians failed to receive "time and a half" their regular rates of pay for the hours they worked over forty (40) each week.

Plaintiff and other technicians made consistent complaints regarding Defendant's unlawful practices. These complaints often resulted in retaliatory conduct or other reprimands. For example, on September 12, 2016, Plaintiff was suspended as a result of his repeated requests for back wages. Plaintiff was terminated a few days later due to seeking the overtime pay he rightfully earned. Plaintiff was terminated only because of his attempts to vindicate his rights. These rights are afforded to Plaintiff and other similarly situated employees under both federal and state wage laws.

Through its unlawful practices, Defendant evaded the payment of wages owed to Plaintiff and others similarly situated. This directly violates the standards set forth by the FLSA, MWHL and the MWPCL. Upon information and belief, Defendant is currently engaged in this unlawful activity.

## THE PARTIES

1.      Plaintiff Kevin Coates (hereinafter, "Plaintiff") is an adult resident of Anne Arundel County, Maryland.

2.      Defendant Bray & Scarff, Inc. (hereinafter, "Defendant") is an incorporated for-profit business. Defendant's principal office is in Baltimore County, Maryland.[4]

---

[4] Hereinafter, any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

3. Defendant distributes and performs maintenance on household appliances across Maryland, Virginia and the District of Columbia. Defendant also provides remodeling services, installation and custom design. Defendant maintains both a distribution and remodeling department for purposes of servicing its customers' needs.

4. Defendant owns and operates numerous retail stores across the mid-Atlantic region. Its products can be purchased at any of these establishments. There are currently thirteen (13) stores in total. The location for each of these stores is as follows:

a. Alexandria, VA: 6733 Richmond Highway, 22306;

b. Annapolis, MD: 2087 West Street, 21401;

c. Arlington, VA: 5715 Lee Highway, 22207;

d. Bethesda, MD: 6801 Wisconsin Avenue, 20815;

e. Bowie, MD: 3801 Evergreen Parkway, 20716;

f. Columbia, MD: 6435 Dobbin Road, 21045;

g. Fairfax, VA: 11015 Lee Highway, 22030;

h. Frederick, MD: 5419 Urbana Pike, 21704;

i. Laurel, MD – Outlet Center: 8610 Cherry Lane, 20707;

j. Rockville, MD: 831C Rockville Pike, 20852;

k. Sterling, VA: 46262 Cranston Street # 102, 20165;

l. Timonium, MD: 10015 York Road, 21030; and

m. Tyson's Corner – Vienna, VA: 8486-D Tyco Road, 22180.

5. Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL. Defendant's business meets the definition of a retail or service establishment.

6. Defendant is subject to the FLSA, MWHL and the MWPCL. Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

7. Based on the nature of the duties performed by Plaintiff as part of his employment with Defendant, at all times relevant to this Complaint, Plaintiff engaged in interstate commerce. Plaintiff routinely crossed state lines in the normal course of performing his duties, transporting materials that had not yet reached their final resting place in commerce: the domicile of Defendant's customers. Additionally, Plaintiff and others similarly situated serviced Defendant's customers that resided in several different states, often doing so during the course of the same workweek and even the same workday.

8. Plaintiff worked for Defendant who, at all times throughout Plaintiff's employment, fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

9. At all times relevant, Plaintiff and other similarly situated employees worked as non-exempt employees for Defendant. The duties assigned to Plaintiff and all others similarly situated do not satisfy the duties tests contained within the exemptions specified in the FLSA, MWHL, or the MWPCL.

10. From approximately February 1, 2014 until September 16, 2016, Plaintiff was employed with Defendant. Plaintiff performed duties specific to providing repair and maintenance services for the appliances purchased by Defendant's customers.

11. Plaintiff typically worked Monday through Friday. His duties were performed across the mid-Atlantic region.

12. At all times relevant to this Complaint, Defendant controlled the administration of its business and set employee schedules, including those of Plaintiff and others similarly situated.

13.     Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiff and other similarly situated employees.

14.     Defendant possessed and exercised authority to determine the hours worked by Plaintiff and others similarly situated.

15.     Defendant had the authority to control Plaintiff's tasks and the tasks of others similarly situated.

16.     Defendant had and exercised the power and authority to change the course of Plaintiff's and other similarly situated employees' duties.

17.     Plaintiff and members of the putative class recognized Defendant's authority and obeyed Defendant's instructions.

18.     Defendant made all decisions relating to Plaintiff's and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

19.     Original jurisdiction in this Honorable Court is expressly provided by the FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

20.     Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

21.     Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction

and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

22.　　Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland. Additionally, Plaintiff is a resident of the State of Maryland and has been for the entirety of the relevant period.

23.　　This Honorable Court has personal jurisdiction over Defendant; Defendant is a corporation incorporated under the laws of Maryland and Defendant conducts sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

24.　　Defendant is engaged in the distribution and maintenance of household appliances. Defendant also performs remodeling work and custom installation on behalf of its customers. To carry out its business, Defendant maintains both a remodeling department and a distribution department.

25.　　Defendant's remodeling department is focused on home improvement and custom design.

26.　　Defendant's distribution department is focused on the actual maintenance and repair of its products.

27.　　Defendant employs "appliance technicians" (hereinafter, "technicians") to perform the maintenance and repairs needed to service its customers. These services are performed in the customer's home, to which the technician is required to travel.

28.　　Through its technicians, Defendant provides services to customers that reside throughout Maryland, Virginia and the District of Columbia. Defendant issues company trucks to its technicians so that they are able to commute to perform their repair work.

29.     Defendant hired Plaintiff to perform work as a technician.  Plaintiff was hired for the primary purpose of assisting with the repair services that Defendant provides.

30.     Plaintiff was hired on or around February 2, 2014.  John Demico (hereinafter, "Demico") is the agent that offered Plaintiff the position.  Demico is one of Defendant's team leaders.

31.     Plaintiff's and other technicians' duties centered on maintaining the appliances purchased by Defendant's customers.  They had to ensure that the appliances operated correctly.  They also instructed customers on how to properly operate the appliances.

32.     Plaintiff and other technicians serviced a wide range of appliances.  Refrigerators, dishwashers, washers, dryers and microwaves are just some examples.  The appliances came in various sizes.  There were also a variety of brands for a customer to choose from.  Plaintiff and other technicians had to be familiar with how to repair and maintain the various brands.

33.     Defendant's technicians could be required to install the appliances once a purchase was made.  This often entailed the technicians having to connect the appliances to a water or gas line.

34.     Plaintiff and other technicians had to regularly inspect the appliances.  Plaintiff and others similarly situated would routinely check for leaks and look for other problems once a product was installed.  This could entail having to perform diagnostics in order to determine if a product was operating at maximum efficiency, or why a product malfunctioned.

35.     Plaintiff and other technicians would regularly dismantle and reassemble the appliances in order to diagnosis the issue.  They were also charged with repairing and replacing any defective components that were found.

36.     At the beginning of each shift, Plaintiff and other technicians were first required to report to Defendant's warehouse.  For the majority of the relevant period, Plaintiff and other technicians had to report to Defendant's warehouse located in Alexandria, Virginia.[5]  Upon arrival, they would "punch-in" through use of Defendant's punch-card system.  The system would automatically mark the time at which Plaintiff and other technicians arrived at the warehouse each morning.

37.     Before they could begin their assignments, Plaintiff and other technicians would first have to acquire their service tickets.  The tickets outlined Plaintiff's and other technicians' daily activities.

38.     Service tickets were typically issued to the technicians at the warehouse each morning.  They would also receive phone calls throughout their day in reference to additional work orders to be completed.  Defendant maintained complete control regarding how the service tickets were distributed.

39.     Each ticket corresponded with the appliances that needed repair or maintenance.  Each ticket also contained the information for the customer who was scheduled to receive the service.

40.     The tickets provided Plaintiff and other technicians with all the information needed to perform their tasks.  This included the materials that were to be utilized and the type of work to be performed.  The parts and components needed to perform the work were also listed.

---

[5] Prior to September 12, 2016, the warehouse in which Plaintiff and other technicians were to report was located under Defendant's retail store in Alexandria, VA.  However, the technicians are now required to report and obtain their materials from Defendant's headquarters in Laurel, MD.  Henceforth, any reference to "Defendant's warehouse" is in regard to the warehouse that Plaintiff and other technicians were required to report to at the time.

41.     At the warehouse each morning, Plaintiff and other technicians had to obtain all of the materials needed to complete the repairs noted on their service tickets.  They used company vehicles for purposes of transporting these materials and themselves.

42.     During the normal course of performing his duties, Plaintiff drove a Nissan NV 1500 Cargo Van with an approximated gross vehicle weight ("GVW") between eight thousand five hundred and fifty pounds (8,550.00 lbs.) to nine thousand nine hundred and one pounds (9,901.00 lbs.).

43.     Once in possession of their service tickets and the materials needed to perform their daily tasks, Plaintiff and other technicians would depart from the warehouse.  They were immediately dispatched to the first customer scheduled for service.

44.     Plaintiff and other technicians were each assigned a state in which they were to perform their repair and maintenance work.  They only provided repair and maintenance services to customers who resided in the state they were assigned.

45.     The service tickets were not limited to a particular geographic area within Plaintiff's and other technicians' assigned state.  This resulted in Plaintiff and other technicians having to travel throughout various regions within their state in order to complete the work orders.

46.     For instance, Plaintiff was assigned to complete service tickets for customers that lived in Virginia.  His coverage area included many different areas of Virginia.  Plaintiff regularly completed work orders in Leesburg, Ashburn, Round Hill, Sterling, Herndon and Oakland.  He had to travel to various suburban areas and counties in order to service Defendant's customers.

47.     Due to the vast areas they had to cover, Plaintiff and other technicians regularly drove long distances in between their assignments.  The customers' homes were often spaced far apart.  It was typical for the customers' residences to be located many miles away from one another.  This required Plaintiff and other technicians to spend many hours traveling each day.

48.     Upon reaching the customer's home, Plaintiff and others similarly situated retained no discretion in the performance of their tasks.

49.     Their duties solely consisted of repair and maintenance services in accordance with Defendant's guidelines.

50.     Plaintiff and other technicians were not authorized to negotiate the price of these services.

51.     Plaintiff and others similarly situated were not authorized to collect any type of payment while in a customer's home.

52.     Plaintiff and other technicians were not responsible for the preparation of invoices.

53.     Plaintiff and other similarly situated employees never evaluated repair estimates.

54.     Plaintiff and others similarly situated were not tasked with record keeping as it relates to any chief aspect of Defendant's business.

55.     Plaintiff and other technicians were not involved with inventory.

56.     Plaintiff and others similarly situated did not make any product recommendations.  Providing maintenance and repairs for the products represented the full scope of their duties.

57.     The performance of their duties did not require any specialized training.

58.     Plaintiff's and other technicians' tasks did not require any advanced knowledge or formal education.

59. Plaintiff and others similarly situated did not perform any true analysis.

60. Plaintiff and other technicians did not interpret any fundamental information.

61. Plaintiff and other similarly situated employees did not write any substantive reports.

62. Plaintiff and other technicians satisfied the requirements of their jobs and adequately performed their duties to benefit Defendant, as well as Defendant's customers.

63. Plaintiff and others similarly situated performed their duties to the extent required by Defendant.

64. For the entirety of his employment, Plaintiff worked as an hourly employee for Defendant. Plaintiff received bi-weekly payments reflecting a pay rate of approximately twenty-six dollars and seventy cents ($26.70) per hour. Plaintiff never received a raise.

65. Each morning, Defendant required that Plaintiff and other similarly situated technicians report to their assigned warehouse. It was typically required that they arrive by 8:30 a.m. However, the times that the technicians actually arrived varied.

66. It was common for Plaintiff and others similarly situated to begin their shifts at different times. This was primarily dependent upon the length of their respective commutes to Defendant's warehouse.

67. For instance, Plaintiff was primarily required to report to Defendant's warehouse in Alexandria, Virginia. He would commute from his home each day that he was scheduled to work. It usually took an hour and a half to get there. Plaintiff would routinely leave his house early in an attempt to avoid traffic. This practice resulted in Plaintiff typically arriving to the warehouse by 7:30 a.m.

68.     The time that Plaintiff's and the other technicians' day ended also varied.  This was entirely dependent upon the time they completed their last scheduled service appointment.

69.     At the conclusion of their last appointment, Plaintiff and other technicians would write down the time they finished.  This was completed manually by notating their daily end times on their time cards.  Plaintiff and the other technicians carried their time cards with them in the field.

70.     At the end of each week, Plaintiff and other technicians would submit their time cards to one of Defendant's agents.  The agents would then forward the time cards to Defendant's headquarters.

71.     When their employment began, Defendant informed Plaintiff and other technicians that they were to work a forty-hour (40) week.  Plaintiff and other technicians were supposed to work five (5) eight-hour (8) shifts each week.  They were scheduled to work Monday through Friday.

72.     For the duration of their employment, Plaintiff and other technicians regularly worked more than eight (8) hours each day.  They consistently worked in excess of forty (40) hours per week.  The primary reason that caused Plaintiff and other technicians to work overtime was the method in which their service tickets were assigned.

73.     At the start of each shift, Plaintiff and other technicians were given their list of tickets.  Defendant made clear to Plaintiff and other technicians that they were required to complete all of their work orders before they could leave each day.

74.     Plaintiff and others similarly situated were advised of this policy at the time their employment began.  This was strictly enforced for the duration of their employment.

75.    The method Defendant used to distribute the work orders did not take into account any geographic factors.  Consequently, the technicians' work assignments were not efficiently clustered.  The addresses for where their services were to be provided were positioned throughout various parts of the state.  This routinely required Plaintiff and other technicians to drive substantial distances in between each service address.

76.    The added drive time regularly prevented Plaintiff and other technicians from completing all of their work orders within an eight (8) hour shift.  Completing all of their work assignments within this timeframe was often physically impossible.  This substantially contributed to the overtime hours worked by Plaintiff and other technicians.

77.    Plaintiff and other technicians often had to travel back and forth to various cities located within their state.  This was a consistent practice throughout their workday.

78.    It was not uncommon for service appointments that were scheduled later in the day to be located in close proximity to where earlier appointments were scheduled.  This was the direct result of the disorganized and inefficient system by which Plaintiff's and other technicians' work orders were assigned.

79.    Because the service tickets were not grouped by geographic region, it was common for Plaintiff and other technicians to have to travel to one part of a state to complete their first assignment, and then to a different city or county to complete the next.

80.    For instance, Plaintiff was scheduled daily to provide service in various cities and counties of Virginia.  On multiple days throughout his employment, Plaintiff was scheduled to provide services in Leesburg, Ashburn, Round Hill, Sterling, Herndon, Oakland and other cities across the state.

81.     The distance between each city was often substantial, contributing to the amount of time it took Plaintiff to get to his next job upon completing the service tickets that were scheduled earlier.  These conditions impacted the total amount of overtime that Plaintiff worked.

82.     Other similarly situated technicians were subject to these same conditions.  They were also required to travel across various regions throughout their respective states in order to complete their service tickets.  They too had to travel to multiple locales in a single day.  These conditions caused other technicians to work overtime regularly.

83.     Regardless of the amount of drive-time that was required, Defendant did not attempt to reassign the service tickets in order to better accommodate Plaintiff's and other technicians' schedules.  Defendant's failure to assist its technicians caused them to work overtime consistently.

84.     Upon review of their service tickets, the technicians often discovered that the proximity between certain assignments would be better suited for another technician to complete.  However, Defendant routinely failed to permit Plaintiff and other technicians to exchange work orders amongst themselves.  They had to follow the requirements noted within their specific service tickets precisely.  This factor also contributed to the overtime hours worked by Plaintiff and other technicians.

85.     Understaffing also affected their schedules.  When their employment began, Plaintiff and other technicians were told that each technician would be assigned a maximum of seven (7) service tickets each day.  It was made clear that they would not be required to complete any more than seven (7).

86.     During the first four (4) months of Plaintiff's employment, he was in fact limited to only seven (7) work orders to complete.  During this period, Plaintiff was able to complete all

of his daily service tickets without having to work overtime. Soon thereafter, these circumstances changed.

87. Following Plaintiff's first four (4) months of employment, he began to receive nine (9) or more daily service tickets to complete. The number of work orders given to other technicians also increased during this period. The increase directly resulted from the regional expansion of Defendant's business.

88. The growth in Defendant's sales directly impacted the number of hours that Plaintiff and other technicians had to work. Their work hours began to increase dramatically. This in turn contributed to the number of overtime hours that Plaintiff and other technicians were required to work each week. This number increased significantly as their employment progressed.

89. Defendant's business has continued to grow. However, Defendant has failed to hire additional technicians to assist with the maintenance of its products.

90. Although Plaintiff's workload increased during the course of his employment, there were never more than five (5) technicians assigned to provide service in Virginia. Consequently, Plaintiff and other technicians were required to complete additional service tickets without any help from others.

91. The increased number of tickets they had to complete caused Plaintiff and other technicians to sustain an even greater amount of travel time. This further impacted the number of overtime hours they worked each week.

92. Due to the amount of drive time Plaintiff and other technicians endured, they were rarely able to take a break. The demands of his position led Plaintiff to rarely, if ever take a full

lunch break.[6]  The practice of having to travel from one job to the next forced Plaintiff and other technicians to work non-stop.

93.     In addition, although Plaintiff and other technicians often drove several hours each day to reach their customers' residences, this time did not include the time spent in a customer's home actually making the repairs.

94.     The amount of time it took to complete each service ticket varied.  The time was typically dependent upon the complexity of the work that was required.  The complexity of many of their tasks often required Plaintiff and other technicians to stay in a customer's home for an extended period.  It was common for service appointments to run longer than anticipated.  These conditions further contributed to the number of overtime hours Plaintiff and other technicians worked.

95.     As a result of all the aforementioned circumstances, Plaintiff and others similarly situated consistently worked well over forty (40) hours each week.  Plaintiff can recall often having to work as many as fifty (50) hours in a week.  There were periods when Plaintiff and other technicians had to work even more.

96.     Plaintiff and other technicians were not properly compensated for working these extra hours.  Defendant failed altogether to compensate Plaintiff and members of the putative class for any hours they worked over forty (40) in a week.

97.     For the duration of their employment, Plaintiff and other technicians only received payments for working exactly forty (40) hours.  This was regardless of how many hours they actually worked that week.

---

[6] Throughout his employment, Plaintiff can recall periods when he would occasionally eat in his truck while driving from one work assignment to the next.

98.     It is also Defendant's company policy to not pay overtime.[7]  This was made clear to Plaintiff and other technicians at the commencement of their employment.

99.     Plaintiff and other similarly situated employees were not compensated at a rate of "time and a half" their regular rates of pay.  This occurred for the duration of their employment.

100.    There is no bona fide dispute that Plaintiff and other technicians are owed overtime wages for all hours worked over forty (40) in a workweek.

101.    The duties performed by Plaintiff and other technicians did not implicate any exemptions contained within the FLSA, MWHL, or the MWPCL.

102.    Defendant was well aware of the overtime hours worked by Plaintiff and other technicians.

103.    Defendant knew that Plaintiff and other technicians customarily worked over forty (40) hours per week.

104.    Defendant consistently tracked these hours worked.

105.    Defendant required Plaintiff and other technicians to clock-in immediately upon their arrival to the warehouse.

106.    Defendant also required Plaintiff and other technicians to record when their workday concluded.

107.    Plaintiff and other technicians had to submit timesheets regularly throughout their employment.

108.    It was required that they submit their time records on a weekly basis.

---

[7] In lieu of overtime payments, when Plaintiff's employment first began, he and other technicians would occasionally receive gift cards from Defendant.  The gift cards were of various types.  The value of the gift cards typically ranged between ten dollars ($10.00) and twenty-five dollars ($25.00).  The gift cards had no correlation in regard to the number of overtime hours worked by Plaintiff and the other technicians.  They were also dispersed sporadically.

109.    The records clearly documented the overtime hours worked by Plaintiff and other technicians.

110.    Defendant suffered and/or permitted Plaintiff and others similarly situated to work these overtime hours.

111.    Defendant, acting without good faith, withheld the overtime wages owed to Plaintiff and other technicians.  This continued even after Plaintiff and others similarly situated inquired about the wages missing from their pay-checks.

112.    Throughout his employment, Plaintiff consistently complained about his failure to receive overtime wages.  Defendant was well aware of Plaintiff's complaints.

113.    Plaintiff's complaints were typically made to either his team captain, Demico, or his supervisor, "Wayne."[8]  Plaintiff made clear to these management officials that he should be paid overtime wages.  Plaintiff repeatedly advised Defendant's agents that he was receiving less than what he was entitled to.

114.    In response, Plaintiff was told by his supervisors to "take it or leave it." Plaintiff's supervisors told him that if he didn't like the fact that he wasn't being paid overtime, he should simply hand in his keys and find another job.

115.    Plaintiff was punished for attempting to vindicate his rights.  As a result of his numerous complaints for missing wages, Defendant suspended Plaintiff without pay.  This occurred on September 12, 2016.  Plaintiff's suspension lasted three (3) days.

116.    Defendant's retaliatory acts continued.  Plaintiff was to return to work on Friday, September 16, 2016.  However, upon his return, Plaintiff was terminated on the spot.

---

[8] For the duration of his employment, Plaintiff referred to his direct supervisor as "Wayne."  Mr. Wayne's last name is currently unknown.  Mr. Wayne's last name is readily available in Defendant's records.

117. Although Plaintiff was advised that he was let go based on his performance, Plaintiff's termination was the direct result of his refusal to continue to work without proper compensation.

118. Terminating Plaintiff under the pretense of not meeting the requirements of his position was simply a ruse implemented by Defendant.

119. Plaintiff's termination was the result of Defendant's attempts to avoid liability for its failure to pay Plaintiff correctly.

120. Consequently, on behalf of himself and all those similarly situated, Plaintiff seeks the wages to which he is entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

121. Plaintiff and other similarly situated employees work or worked as technicians for Defendant. Their duties centered on the performance of repair and maintenance work.

122. The FLSA requires employers to compensate non-exempt employees such as Plaintiff and others similarly situated overtime wages for all hours worked over forty (40) within a workweek.

123. Defendant knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

124. Defendant suffered or permitted Plaintiff and other similarly situated technicians to work more than forty (40) hours per week.

125. Defendant knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

126. Pursuant to the FLSA, Plaintiff commences this collective action against Defendant on behalf of himself and those similarly situated.

127. Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times his regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations. Plaintiff makes these same demands on behalf of all members of the putative collective.

128. Plaintiff consents to be party plaintiff in this matter. Plaintiff's consent form is attached to this Complaint as Exhibit A.

129. It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

130. There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA.

131. These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

132. Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

133. Upon information and belief, others will choose to join Plaintiff in this action against Defendant and opt in to this lawsuit to recover unpaid wages and other available relief.

**CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS**

134. Plaintiff brings this action Pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and other current and former employees that served as technicians for Defendant and were subject to the following practices and policies:

135. Denial of overtime wages under MWHL for hours worked over forty (40) in a single workweek; and

136.     Denial of all wages owed to Plaintiff and other similarly situated technicians at the termination of their employment in violation of the MWPCL.

137.     The classes Plaintiff seeks to represent are defined as:

138.     *MWHL Class*: All individuals who are or were employed by Defendant as technicians for any period ranging from January 9, 2014 to the present and who were not paid an overtime rate of time-and-a-half their regular rate for all hours worked over forty (40) in a workweek.

139.     *MWPCL Class*: All individuals who were, but are no longer, employed by Defendant as technicians for any period of time ranging from January 9, 2014 to the present and who were not paid an overtime rate of time-and-a-half their regular rate for all hours worked over forty (40) in a workweek and thus, did not receive all wages owed to them before the termination of their employment.

140.     Numerosity: The individuals in the class are so numerous that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, upon information and belief, the class includes dozens of employees who are readily identifiable through Defendant's pay records. Defendant employs dozens of technicians across the mid-Atlantic region. Through its technicians, Defendant services hundreds of customers throughout Maryland, Virginia and the District of Columbia. Consequently, numerosity exists.

141.     Commonality: There are questions of law and fact common to the classes. Among the common questions of law and fact applicable to Plaintiff and the classes are:

    a.   Whether the MWHL class is similarly situated because they all performed the same basic duties and were subject to Defendant's common policy and practice of not paying the class overtime;

b. Whether Defendant employed the MWHL class within the meaning of MWHL;

c. Whether Defendant violated MWHL by failing to pay Plaintiff and the MWHL class overtime compensation for hours worked in excess of forty (40) hours per workweek;

d. Whether Defendant's violations were willful;

e. Whether Defendant employed the MWPCL class within the meaning of the MWPCL;

f. Whether Defendant failed to provide Plaintiff and other members of the MWPCL class with all wages due at the time their employment ended; and

g. Whether Defendant is liable for damages claimed herein, including but not limited to, compensatory, liquidated or treble, statutory, interest, costs and attorneys' fees.

142. Typicality: Plaintiff's claims are typical of those of the classes. Specifically, each and every class member of both the MWHL class and the MWPCL class work or worked as a technician for Defendant and was assigned to service Defendant's customers located in a particular state. Each and every MWHL class member was required to work well over forty (40) hours per workweek to keep up with Defendant's imposed schedule and regular understaffing. Each class member was paid an hourly rate for forty (40) hours per week, regardless of the number of hours worked each week. Every member of the MWPCL class failed to receive all wages owed to them at the end of their employment. As a result, each and every class member suffered the same harm. This was due to Defendant's failure to pay a proper overtime premium for all hours worked in excess of forty (40) hours per workweek and the subsequent failure to pay to Plaintiff and other members of the MWPCL class all wages owed to them at the

conclusion of their employment. This constitutes a direct violation of MWHL, as well as a subsequent violation of the MWPCL.

143. Adequacy: Plaintiff will fully and adequately protect the interests of the classes. He seeks the same recovery as the classes, predicated upon the same violations of the law and the same damage theory. Plaintiff has also retained counsel who are qualified and experienced in the prosecution of statewide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the classes.

144. Predominance: The common issues of law and fact predominate over any individual issues. Each class member's claim is controlled by Maryland's wage and hour statutory scheme and one set of facts. This is based on Defendant's failure to pay overtime as required by MWHL and its subsequent failure to pay all wages due at the end of an individual's employment as required by the MWPCL. Similarly, the damages are eminently certifiable in that Defendant's records will provide the amount and frequency each class member was paid. The amount of time each class member worked is also available through Defendant's records.

145. This action is maintainable as a class action. The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications with respect to individual members of the classes. This would establish incompatible standards of conduct for Defendant. If they were to pursue their claims separately, the numerous adjudications that would be required to protect the individual interests of the class members would constitute a terrific drain and burden on judicial resources. Accordingly, the Court should certify the proposed classes.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiff and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff

146. Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

147. Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

148. As described above, Plaintiff has not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek; Defendant failed to compensate Plaintiff for these additional hours.

149. Defendant willfully and intentionally failed to compensate Plaintiff for the overtime wages he is owed.

150. There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

151. Under the FLSA, Plaintiff is entitled to additional wages from Defendant to compensate him for the hours he worked in excess of forty (40) in a workweek at a rate of one and one-half (1.5) times his regular hourly wage rate.

### Count II. Violation of MWHL: Failure to Pay Overtime Wages to Plaintiff, all those that are Joined as Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court, and the MWHL Class to be Certified by Motion During the Course of this Matter

152. Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

153. Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

154. Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

155. Plaintiff has not received compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

156. Defendant willfully and intentionally did not compensate Plaintiff for the overtime wages he is owed.

157. There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

158. Under MWHL, Plaintiff is entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times his regular hourly wage rate.

***Count III - Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Their Employment to Plaintiff, all those that are Joined as Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court, and the MWPCL Class to be Certified by Motion During the Course of This Matter***

159. Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

160. Plaintiff is entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501, *et. seq.*, which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

161.    Plaintiff has not received compensation from Defendant for all wages owed for work performed before the termination of his employment as required by Md. Code Ann., Lab. & Empl. §3-505(a).  This is specific to Defendant's failure to pay Plaintiff the overtime wages to which he is entitled.

162.    Defendant willfully and intentionally did not compensate Plaintiff for the wages owed to him and continued to violate the MWPCL, even after Plaintiff informed Defendant of the violation.

163.    Under the MWPCL, there is no bona fide dispute that Plaintiff is owed wages for work performed while employed by Defendant.

***Count IV.  Violation of the FLSA: Retaliation Against Plaintiff for His Complaints Made to Defendant for His Wages Owed.***

164.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

165.    The FLSA prohibits an employer from discharging or discriminating against any employee because such employee filed a complaint, or instituted, or caused to be instituted, any proceeding related to unpaid minimum and/or overtime wages owed to an employee under the FLSA. 29 U.S.C. § 215(a)(3).

166.    An employer in violation of 29 U.S.C. § 215(b)(3) is liable for such legal or equitable relief as may be appropriate to effectuate the purposes of said provision.

167.    As described above, Plaintiff made numerous complaints to Defendant regarding his missing wages.

168.    In response to Plaintiff's complaints, Defendant suspended Plaintiff for three (3) days without pay.

169.    Upon returning to work, Plaintiff was promptly terminated under the pretense that he had failed to complete the requirements of his position.

170.    This pretense was used as a ruse for purposes of disguising Defendant's blatant retaliation against Plaintiff for attempting to exercise the rights guaranteed to him by the FLSA and MWHL.

171.    Such retaliation amounts to a willful violation of the FLSA, for which Plaintiff is entitled to recover legal or equitable relief appropriate to effectuate the purposes of Section 15(a)(3), including the payment of wages lost and an equal amount in liquidated damages, as well as attorneys' fees and costs. *See* 29 U.S.C. § 216(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and others similarly situated, prays for the following relief:

a)    In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)    In accordance with Rule 23 of the Federal Rules of Civil Procedure, designation of this action as a class action on behalf of Plaintiff and members of the classes certified by motion during the course of this litigation;

c)    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, and emails of all those individuals who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated individuals;

d)    Designating the named Plaintiff to act as a class representative on behalf of all similarly situated employees for the FLSA collective class;

e)    Designating the named Plaintiff to act as a class representative on behalf of all members of the classes certified during the course of this litigation;

f)    Judgment against Defendant for its failure to pay Plaintiff, and those similarly situated, in accordance with the standards set forth by the FLSA;

g) Judgment against Defendant for its failure to pay Plaintiff and members of the MWHL class in accordance with the standards set forth by MWHL;

h) Judgment against Defendant for its failure to pay Plaintiff, those appropriately joined to this matter and all members of the MWPCL class in accordance with the standards set forth by the MWPCL;

i) Judgment against Defendant and classifying its conduct as willful and not in good faith;

j) Judgment against Defendant and classifying Plaintiff, the collective class, those appropriately joined in this matter and members of all classes certified as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

k) An award against Defendant for the amount of unpaid overtime wages owed to Plaintiff, those similarly situated and members of all classes certified, calculated at a rate that is not less than one and a half (1.5) times Plaintiff's, all other similarly situated employees' and members of all certified classes' regular hourly rate for all overtime hours worked;

l) An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiff, those similarly situated and members of all classes certified during the course of this litigation, whichever is deemed just and equitable by this Honorable Court;

m) An award of back-pay equal to forty (40) hours at Plaintiff's regular hourly rate per week, beginning on the day Plaintiff was terminated and running until final judgment is rendered;

n) An award of liquidated damages equal to the total amount of back-pay owed to Plaintiff as a result of his retaliatory termination;

o) Injunctive relief in the form of full reinstatement of Plaintiff in Defendant's employ, at his prior hourly rate, as permitted by 29 U.S.C. § 215(b)(3);

p) An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

q) Leave to add additional Plaintiffs to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

r) All further relief deemed just and equitable by this Honorable Court.

<u>**REQUEST FOR JURY TRIAL**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of his peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
George E. Swegman, Esq. (19444)
gswegman@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiff*